# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROBEN CARTER and husband** | ) | |
| **TIMOTHY CARTER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-0930** |
| | ) | **Judge Sharp** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this action brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, Plaintiffs Roben and Timothy Carter, husband and wife, allege that medical providers at the Blanchfield Army Community Hospital ("BACH") at the Fort Campbell Army Installation[1] were negligent in failing to timely diagnose Ms. Carter's breast cancer. A bench trial was held on December 10-12, 2013. The Government, while unable to concede liability, did not contest the point, and the Court found liability in favor of Plaintiffs.[2] After trial, the parties were instructed to file proposed findings and conclusion, the last of which was filed on February 25, 2014.

Having reviewed the parties' proposed findings and conclusions, their arguments, the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Except where the Court

---

[1] Fort Campbell straddles Kentucky and Tennessee. BACH is located in Tennessee.

[2] Although liability has been established, some discussion in the delay of diagnosis is necessary to place the damage requests in context.

discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts it deems to be immaterial to the issues presented. Finally, to the extent that a finding of fact constitutes a conclusion of law, the Court so concludes; to the extent that a conclusion of law constitutes a finding of fact, the Court so finds.

## I. <u>FINDINGS OF FACT</u>

1. Mrs. Carter is 40 years old. She and Mr. Carter have been married since 1995, and are the parent of two children ages 10 and 14.

2. Mr. Carter is a periodontist. In 2008 he was a Major in the United States Army and served at Fort Campbell. On June 30, 2010, he was honorably discharged and now has a private dental practice in Clarksville, Tennessee where Mrs. Carter works as the office manager.

3. BACH is the primary source of healthcare for the 30,000 soldiers and their dependents at Fort Campbell. It relies heavily upon physician assistants and nurse practitioners to serve as the primary care managers for patients.

4. On June 27, 2008, Ms. Carter reported to the Blue Clinic at BACH which was the designated primary care department for her and her family's primary care needs. She was seen by nurse practitioner Gwyneth Ferdinand Jacobs.

5. At the time, Ms. Carter had a single lump on each side of her breasts, which she had discovered some two months earlier. Both lumps were approximately one centimeter in size and were palpable, meaning that they could be felt. Ms. Jacobs ordered a bilateral diagnostic mammography for July 22, 2008.

6. On July 22, 2008, Ms. Carter reported to the radiology department at BACH and

completed a breast imaging study sheet, or BISS sheet.  That form includes questions and contains

an anatomical diagram for patients to note irregularities.  Ms. Carter completed the form, noting

tenderness and a lump or mass in each breast.  She also marked the anatomical chart, indicating that

there was a lump at 9:00 on the right breast, and 3:00 on the left breast.

7.  Mariana Distefano, a radiology technologist, performed a diagnostic mammography and

ultrasound test.  On the BISS sheet, she noted a palpable abnormality on both breasts.  The films

were subsequently read by Dr. Wallace W. Pawlak, a radiologist.

8.  On the BISS sheet, Dr. Pawlak noted that the findings indicated "BIRADS 4-A,"[3] which

meant that there was a "suspicious finding by virtue of a palpable solid mass with benign imaging

features."  (Coll. Ex.  Tab 51A at 1[4]).  Dr. Pawlak also dictated his findings and impressions, but

they were ambiguous.  In his findings, he specifically mentioned that sonographic images  revealed

no presence of a solid or cystic mass in the right breast, and that images of the left breast showed

the "presence of multiple benign appearing anechoic lesions." (Id. at 2).  In his impression, however,

while stating that Mrs. Carter was BIRADS 4-A, Dr. Pawlak wrote, "[s]uspicious finding by virtue

of palpable solid mass with benign imaging feature of left breast."  (Id.). The "suspicious finding"

is presumably a reference to the right breast, because Mrs. Carter was rated BIRADS 4-A and the

lump in the right breast could not be ruled out as benign.

9.  Two days after the medical screening, Lieutenant Colonel Kathleen L. Rowe, Chief of

Mammography Services at BACH, wrote a letter to Mrs. Cater indicating that the mammogram and

---

[3]BIRADS is an acronym for Breast Imaging – Reporting and Data and assesses the risk of breast
cancer.  At the time, the scale went from BIRADS 0 to BIRADS 5, with a higher number indicative of a
greater risk of cancer. BIRADS 4A is immediately below BIRADS 5 which is "highly suggestive of
malignancy."

[4]  The parties stipulated to the admission of Mrs. Carter's medical records.

ultrasound appeared to be benign, but, because there was a palpable lump, it was recommended that Mrs. Carter contact her primary care provider for a referral to the General Surgery Clinic.[5] Mrs. Carter did not receive this letter and the letter appears to have been placed in her mammography file and not in her treatment files.

10. Having heard nothing of the results of her mammography, Mrs. Carter called BACH at the beginning of November 2008. She went to the Blue Clinic on November 7, 2008, where she was seen by Nurse Practitioner Jewell Lay. After examination, Ms. Lay ordered bilateral diagnostic mammography and ultrasound. For unclear reasons, those orders were cancelled or revised such that no mammography was done and only an ultrasound was done on the left breast on January 20, 2009.[6] The ultrasound of the left breast was interpreted by Captain Terrence Bennett, a radiologist, as being benign.

11. There was no follow-up to the January 2009 ultrasound by Ms. Lay, and Mrs. Carter apparently was not informed of the results. However, Mrs. Carter continued to monitor her right breast.

12. In March 2010, Mrs. Carter returned to the Blue Clinic. An image of her right breast on March 31, 2010, was read as a BIRADS 4, and a biopsy was recommended. A subsequent needle biopsy revealed "an intermediate grade infiltrating ductal carcinoma." (Id. Tab 22 at 1). Mrs. Carter decided to go to Vanderbilt University Medical Center for further care.

13. Dr. Vandana Abramson is Mrs. Carter's treating oncologist and testified at trial. Dr.

---

[5] Because the ultrasound was image negative and the lump was palpable and had been for some time, a biopsy should have been performed. While an ultrasound or mammogram may identify something suspicious, it does not rule out the possibility that a lump is malignant.

[6] It is likely that another BISS sheet was filled out for this examination but that record, if it exists, cannot be found.

Abramson is board certified in both internal medicine and oncology and is an assistant professor of medicine, hematology and oncology at Vanderbilt University Medical Center. Her entire clinical practice is devoted to breast cancer patients.

14. Dr. Abramson has authored numerous articles on breast cancer, many of which deal with triple-negative breast cancer. Triple-negative breast cancer means that the cancer cells are negative for estrogen receptors, progesterone receptors, and HER2 (human epidermal growth factor receptor 2). Consequently, the tumor is not fed by estrogen in the body, generally limiting the available treatment to chemotherapy. According to Dr. Abramson, this is often considered to be the most aggressive type of breast cancer, at least in part because there are no targets to treat via hormone therapy or HER2 directed therapy.

15. When Dr. Abramson first saw Mrs. Carter, the lump in the right breast "was a very, very large mass, especially for somebody who is small" and was around five to seven centimeters in size on physical examination. (Docket No. 61, Tr. Tran. at 60). It was clinically sized as being Stage 3 cancer and was triple negative.

16. Because the cancer was triple negative, Mrs. Carter underwent 12 weeks of chemotherapy with two drugs, Cisplatin and Taxol. She also received at least four treatment with Adriamycin and Cytoxan. Even after chemotherapy, the tumor was two centimeters, and at least two lymph nodes had cancer cells present.

17. In addition to chemotherapy, Mrs. Carter underwent a double mastectomy and removal of 21 lymph nodes. Thereafter she underwent breast reconstruction surgery, which required stretching the skin and harvesting grafts from her inner thighs.

18. According to Dr. Abramson, a patient like Mrs. Carter who still has some of the cancer

left after chemotherapy at the time of surgery has a "significantly worse [prognosis] than somebody who has no cancer left at the time of surgery after 12 weeks of therapy." (Id. at 63). This is because if the chemotherapy kills the cancer that is in the breast, the likelihood exists that cancer cells in the bloodstream will have been killed as well. On the other had, if "somebody still has any amount of disease left after chemotherapy at the time of surgery. . . the real issue is cancer cells that might be floating around in the blood stream, and those cancer cells could attach onto another organ like the liver or lung." (Tr. Tran. Docket No. 61 at 62).

19. More specifically, Dr. Abramson testified that patients who achieve a complete response to chemotherapy most likely will be alive 75 months later. However, patients like Mrs. Carter, who are triple negative, have a large tumor, and lymph node involvement have a much lower survival rate, with Dr. Abramson opining there was a 60% likelihood that Mrs. Carter's cancer would recur within five to seven years. The longer a patient survives past the five to seven year mark, the less likely that cancer will recur. If the cancer does recur, however, it will almost certainly be fatal.

20. Dr. Abramson also opined that when Mrs. Carter was seen in July 2008 and January 2009 at BACH, it was likely that the cancer was Stage 1 and had not metastasized. Further, the treatment would have been far less aggressive. Instead of a mastectomy, there probably would have been a lumpectomy,[7] and instead of a full axillary lymph node dissection, Mrs. Carter would have likely had a sentinel lymph node biopsy.[8] While Mrs. Carter would have undergone chemotherapy, it is not likely that Cisplatin would have been used in the regimen.

_____

[7] A mastectomy removes the entire breast while a lumpectomy remove the tumor and a margin of of the surrounding tissue.

[8] A sentinel node biopsy is used to determine if cancer has spread beyond the cancerous tumor into the lymphatic system and involves checking the lymph node(s) nearest the tumor. An axillary lymph node dissection involves the entire removal of many lymph nodes.

21. By the agreement of the parties, the Government presented expert testimony from Dr. Laura F. McClure-Barnes through her expert report. Dr. McClure-Barnes is board certified in both internal medicine and hematology/oncology and is a physician at Tennessee Oncology, PLLC in Hendersonville, Tennessee. In arriving at her opinions, Dr. McClure-Barnes reviewed the medical records relating to Mrs. Carter's care.

22. In several respects, Dr . Abramson and Dr. McClure-Barnes appear to agree that had Mrs. Carter's cancer been diagnosed upon initial presentation: (1) a lumpectomy (with radiation treatment) as opposed to a mastectomy would likely have been an option; (2) an axillary node dissection would probably not have been necessary; and (3) the likelihood of recurrence within 10 years would have been far less than 60%.[9]

23. Although both doctors agree on the 60% survival rate, Dr. Abramson predicts that the cancer will likely recur some 5 to 7 years post-treatment while Dr. McClure-Barnes predicts that the cancer will likely recur some 2 to 5 year post treatment, and that if Mrs. Carter is cancer free "5 years from her diagnosis, it is more likely than not that she will be cured of her breast cancer." (Deft. Ex. 2 at 3). At the time of trial, Mrs. Carter was three years post-treatment.

24. In her report, Dr. McClure-Barnes noted that the removal of Mrs. Carter's left breast was not medically necessary, "but was performed because it was the patients' [sic] preference," and that the removal of that breast did not improve the patient['s] overall survival or prognosis." (Id.). Observing that "[o]ver the last decade there has been an increase in the number of young women who will chose to undergo bilateral mastectomy for a unilateral breast cancer even if lumpectomy

---

[9] Dr. McClure-Barnes wrote in her report that the 10 year recurrence rate for triple negative breast cancer diagnosed at Stage 1 is 27%.

of only the affected breast is needed," Dr. McClure-Barnes speculates that because "Mrs. Carter choose [sic] to have her unaffected breast removed makes it likely that bilateral mastectomy would have still been her preference had she been diagnosed earlier and still a candidate for a lumpectomy."" (Id. at 3).

25.   To the extent that there is a discrepancy in the testimony of Drs. Abramson and McClure-Barnes, the Court credits the former.  Dr. Abramson's entire clinical practice is related to the treatment of breast cancer, she has written extensively on breast cancer (and in particular triple negative breast cancer), she is Mrs. Carter's treating oncologist, and she testified at trial so that the Court was able to assess her demeanor and credibility.

26.   The Court also credit Mrs. Carter's testimony that there was "no way" that she would have elected a bilateral mastectomy had the cancer been discovered by BACH when it was Stage 1.  The Court further credits her testimony that the reason she elected to have both breasts removed, instead of just the right cancerous one, was because she was young and did not want to have to worry about it and wanted to increase the likelihood that her breasts would look symmetrical.  (Tr. Tran. Docket No. 62 at 89).

27.   The failure of the BACH providers to timely diagnose Mrs. Carter's breast cancer allowed the triple negative cancer to grow from a (likely) curable Stage 1 status to a Stage III status that metastasized to the lymph nodes and increased the likelihood of a recurrence that would be fatal.

28.   Had BACH properly diagnosed the breast cancer, Mrs. Carter would have still had to have undergone chemotherapy.  As a consequence, she would have still had the stomach issues, acid reflux, and hemorrhoids that she attributed to that treatment.

29.   However, the delay required otherwise unnecessary surgeries and treatment, including

a mastectomy (though not necessarily a double mastectomy), lymph node removal, and reconstruction surgery. In addition to the pain that is inherent in such surgeries and the subsequent recovery period, those surgeries have left disfigurement in the form of scarring in several areas, including the breasts, under the right armpit (where the lymph nodes were removed) and the inner thighs.[10]

30. The (likely) unnecessary surgery has also resulted in swelling and nerve pain in Mrs. Carter's arm, from the hand to the neck. This pain is exacerbated by activities such as driving, vacuuming, typing on the computer, and other repetitive tasks. To relieve the tingling pain, Mrs. Carter is forced to wear a compression sleeve on her arm, particularly in the summer.[11] Mrs. Carter no longer has the flexibility to do gymnastics or yoga, as she cannot lift her arm above shoulder level without pain.[12] She also cannot sleep on her right side and, if she does, she remains in pain for several days.

31. Mrs. Carter lives with the constant fear and threat that the cancer will return. Every symptom she has is cause for concern. Just by way of examples, Mrs. Carter thought a cold with a cough might be lung cancer, that elevated enzymes in her liver meant liver cancer, or that acid reflux might have been stomach cancer.

32. Mrs. Carter also has fears about what will happen to her family if the cancer were to

---

[10] Skin that grows hair was harvested from the inner thighs during reconstruction surgery to form nipples.

[11] According to Dr. McClure-Barnes: "Mrs. Carter has developed lymphedema of her arm as a side effect of her mastectomy and lymph node dissection. Lymphedema is the accumulation of lymphatic fluid in the interstitial tissue that causes swelling of the limb." (Govt. Ex. 2 at 3).

[12] Mrs. Carter was a gymnastics coach for young girls, including her daughter. Because of her right arm, she is no longer able to catch the children and help them with their flips.

return. That fear is also shared by Dr. Carter. Fear of fatal recurrence is something that they deal with on a daily basis.

33. When Mrs. Carter was diagnosed, Dr. Carter was transitioning from the Army to private practice. Initially, he took a job that required him to travel extensively, but left that job because he was traveling upwards of 200 miles a day and wanted to be closer to his wife. He subsequently opened his own dental practice, and Mrs. Carter works in that office taking care of the books, among other things.[13]

34. Upon leaving the Army, Dr. Carter paid $1,000 monthly COBRA premiums for eighteen months to TRICARE, the military insurance plan for soldiers and their dependents. Dr. Carter also made some co-payments for services Mrs. Carter received, but at trial was unable to quantify the amount other than the $12,000 he paid out-of-pocket because Mrs. Carter's reconstruction surgery was not covered by insurance. He also testified that he believed insurance paid 60% to 70% of the $251,973.77 in past medical bills.

35. Laura Lampton is a Registered Nurse who now works in the field of life care planning at Vocational Economics Inc. She testified as to the cost of future medical treatment and expenses, including (1) fees for professionals , such as oncologists, pain management specialists, psychologists and/or counselors; (2) the costs of diagnostic testing such as blood work, CT-scans, and biopsies; (3) the fees for various procedures, such as the placement of a portacath and chemotherapy; and (4) the costs of medication for the treatment of the effects of chemotherapy. According to Ms. Lampton, such costs and fees would total $436,204 to $850,481 as reflected in her initial report. In her supplemental report, Ms. Lampton included the costs and fees for treatment of

---

[13] Mrs. Carter studied accounting while in college.

Mrs. Carter's lymphedema (including therapy and compression sleeves) and gastroenterology treatment, which would raise those totals to $479,284 to $892,200. Ms. Lampton's calculations are based upon the assumption that the treatment would last between two to four years from recurrence.[14]

36. Ms. Lampton also opined that the costs and fees would increase should the cancer metastasize to the lung, liver, and brain. If it metastasized to the lungs, the additional costs would be $54,046 to $139,326, and if it spread to the liver, the costs would increase by a like amount. If the cancer spread to the brain, the additional costs for medical care, diagnostics, and procedures would be an additional $77,006 to $162,286.

37. No evidence was presented as to the likelihood that a recurrence of the cancer would lead to cancer in the lungs, liver or brain. However, Dr. Abramson testified that breast cancer itself is not fatal; death occurs because the cancer spreads to an organ, such as the liver or the lungs.

38. Linda Lu Jones is a vocational economics analyst who also works for Vocational Economics Inc. Ms. Lu calculates that the present (total offset) value of Mrs. Carter's lost future earning capacity is $738,478. That figure is based upon assessing what Mrs. Carter could have been expected to earn after turning 47 (ten years from the date of her last chemotherapy), and assuming that she would continue to work 14.3 more years (which is the average for a female with a bachelors degree). The figure also assumes at an annual salary of $41,030 per year (which is the average earning of office managers in the Clarksville area), plus 25.6% in fringe benefits.[15]

---

[14] The cost of medicines and the treatment for lynphedema were calculated using a life expectancy of seven years from the date of the report. This is based upon the expectation that if cancer were to recur, it would recur within ten years of Mrs. Carter's December 10, 2010 final chemotherapy treatment.

[15] During her testimony, Ms. Jones acknowledged that Mrs. Carter is presently being paid $8.00 per hour working in her husband's clinic. She pointed out, however, that Mrs. Carter could not be replaced for

39. Ronald E. Missun has a PhD in economics and works for Vocational Economics Inc. as a forensic labor economist. He testified that the present value of Mrs. Carter's future household services is $421,057, or an average of $13,117 per year for a 31.2 year time period . The figure takes into account a fair hourly rate for the amount of work that is performed on average by someone in the same circumstances as Mrs. Carter. In determining present value, Dr. Missun utilized a total offset approach, being of the opinion that the inflation rate for household services would be offset by the interest rates over the roughly thirty year period.

40. Dr. Missun also testified as to his opinion of the present value of the life care plan projected by Ms. Lampton. Depending upon whether Mrs. Carter survived two to four years after recurrence, Dr. Missun estimated that the cost of treating a recurrence of breast cancer would be $479,284 to $892,200; the cost of treating lung and liver metastasis would be the same for each, $59,708 to $154,198; and the cost of treating brain metastasis would be $83,970 to $178,460.

41. In calculating present value for future medical damages, Dr. Missun testified that because cancer would likely recur in the relatively short-term, it was appropriate to analyze recent market trends and, in particular, the recent, historically low interest rates and the short-term growth and discount rates during the years 2002 to 2012. In his opinion, a discount in the money awarded now is inappropriate and that more money presently is needed to insure an income stream seven years later. This is based upon his prediction that the cost of treatment will increase more over the next seven years than could be made by investing in the currentlydepressed market.

42. Mark A. Cohen testified as an expert on behalf of the Government. Dr. Cohen is a Professor at the Owen Graduate School of Management at Vanderbilt University. Dr. Cohen

---

that amount and that one taking the job would probably earn between $40,000 and $50,000 a year.

testified that, with regard Mrs. Carter's potential lost earnings, the assumptions made by Ms. Jones were "fair enough," and that while he "may have done things slightly different . . . the bottom line would not have been much different." (Tr. Trans. Docket No. 63 at 6). Likewise, Dr. Cohen agreed with the reasoning and methodology that Dr. Missun utilized to calculate the value of lost household services. He also agreed with the methodology utilized to assess Mrs. Carter's future medical expenses. Dr. Cohen did, however, take exception to how the experts from Vocational Economics Inc. calculated present value, and set forth what he believes to be the appropriate present value of damages for expected future harm.

43. Utilizing published projections by the Social Security Advisory Board Trust to determine anticipated growth rates for both inflation and interest, Dr. Cohen estimates the present value of Mrs. Carter's potential breast cancer treatment over a two year period to be between $140,231 and $261,372, and to potentially rise to $511,304 should the treatment last four years. He also calculates the present value of her potential lung and liver treatment to be between $31,375 and $80,813 each; and her potential brain treatment to be between $44,462 and $94,139. Finally, Dr. Cohen calculated the present value of Mrs. Carter's lost income at $628,440 and her lost household services at $312,689.

44. Despite the fact that hours were spent at trial on testimony relating to the different ways to calculate present value, and notwithstanding the fact that portions of the post-trial filings discuss that topic, 29 pages into their Propose Findings of Fact and Conclusions of Law, "Plaintiffs stipulate that the Court should award future medical treatment, expenses, based upon the present value calculations of" Dr. Cohen. (Docket No. 67 at 29). Further, in their "Rebuttal Findings of Fact and Conclusions of Law," Plaintiffs write:

. . . Plaintiffs stipulate that the Court should award all economic damages based upon the present value calculations of Mark Cohen, Ph.D. Plaintiffs are not conceding that Dr. Cohen's theories are superior to Dr. Missun's theories. . . . Plaintiffs are willing to accept the Defendant's present value calculations, as the amount of damages that should be awarded for the Plaintiffs' economic losses, so as to avoid an appealable issue.

(Docket No. 68 at 7-8).

45. Given Plaintiffs' recent concession and the fact that Dr. Cohen credibly testified that the total offset approach advocated by Vocational Economics, Inc. has little support in the recent relevant literature and is not employed by the vast majority of economists, the Court will discount future economic damages in accordance with the calculations made by Dr. Cohen.

46. Thomas A. Creech, a licensed funeral director who is part owner of a funeral business in Clarksville testified that the average price for a traditional funeral in 2013 was $16,940, and that the estimated cost of that same funeral in 2020 would be $21,239. He also testified that a "top line" funeral in 2013 was $37,661, and would be $45,569.81 in 2020.

47. As of the time of trial, Mrs. Carter did not have a recurrence of cancer. She is seen by Dr. Abramson every six months.

## II. CONCLUSIONS OF LAW[16]

### A. Liability

After listening to several experts detailing the negligence at BARD, the Court, as noted, directed a finding in favor of Plaintiffs on the issue of liability. For purposes of further establishing the record on this issue, the Court simply notes the following.

"A claim of common law negligence requires proof of the following elements: a duty of care

---

[16] "In analyzing claims brought pursuant to the FTCA, a court must apply the substantive law of the state in which the incident occurred, here Tennessee." Shipp v. United States, 212 F. App'x 393, 397 (6th Cir. 2006) (citing 28 U.S.C. § 1346(b)(1)); see also, Friedman v. United States, 927 F.2d 259, 261 (6th Cir. 1991).

owed by the defendant to the plaintiff; conduct falling below the applicable standard of care that amounts to a breach of that duty; an injury or loss; cause in fact; and proximate or legal cause. <u>Gunter v. Lab. Corp. of Am.</u>, 121 S.W.3d 636, 639 (Tenn. 2003). "Medical malpractice actions are specifically controlled by the medical malpractice statute, Tennessee Code Annotated section 29–26–115, which essentially codifies the common law elements of negligence [and] places on the claimant the burden of proving the following statutory elements: (1) the recognized standard of professional care; (2) that the defendant failed to act in accordance with the applicable standard of care; and (3) that as a proximate result of the defendant's negligent act or omission, the claimant suffered an injury which otherwise would not have occurred." <u>Id</u>. at 639-40; <u>accord</u>, <u>Rye v. Women's Care Center of Memphis, MPLLC</u>, 2014 WL 903142, at *6 (Tenn. Ct. App. Mar. 10, 2014).

Plaintiffs established each of the essential elements of Mrs. Carter's malpractice claim by a preponderance of the evidence.[17] On multiple occasions between June 2008 and January 2009, Mrs. Carter sought care at BACH concerning palpable lumps in both breasts. Radiographic diagnostic tests (mammogram and ultrasound) proved the left breast lump to be benign, but the diagnostic images of the right breast were "image negative." The standard of care concerning a palpable but "image negative" breast lump requires referral to a surgeon to remove the lump, and then laboratory testing.

The failures in timely detecting Mrs. Carter's breast cancer were widespread. They included

---

[17] Dr. Carter brings a derivative claim for loss of consortium. "Pursuant to Tennessee Code Annotated § 25–1–106 (2010), a spouse of a plaintiff who has proven damages from an injury may recover for loss of consortium." <u>Huskey v. Rhea County</u>, 2013 WL 4807038, at *18 (Tenn. Ct. App. Sept. 10, 2013); see, <u>McPeek v. Lockhart</u>, 174 S.W.3d 751, 755 (Tenn. Ct. App. 2005).

failures in communication among medical providers and between those providers and Mrs. Carter; poor or improper record keeping and retention; failure to follow-up; and at least one unexplained cancellation of a medical order.

Had the medical providers not squandered many opportunities and had they provided the duly recognized standard of care, early diagnosis at Stage I would have occurred, breast conservation probably would have been accomplished after removal the 1 centimeter lump, and additional unnecessary surgeries including mastectomy, removal of the lymph nodes, and reconstruction surgery would not have occurred. Additional expenses related to unnecessary pain, suffering, loss of enjoyment of life, and disfigurement also would not have occurred had the cancer been detected in late 2008 or early 2009 rather than in April 2010. Moreover, early diagnosis and intervention would have markedly increased Mrs. Carter's chance of survival. Instead, the delay in diagnosis makes is more likely than not that there will be a fatal recurrence of cancer within 10 years.

**B. Damages**

With the finding of liability, Plaintiffs are entitled to be made whole, to the extent that can be done through money damages. "A plaintiff may be compensated for any economic or pecuniary losses that naturally result from the defendant's wrongful conduct [which] include out-of-pocket medical expenses, future medical expenses, lost wages, and lost earning potential." Meals _ex rel._ Meals v. Ford Motor Co., 417 S.W.3d 414, 419-20 (Tenn. 2013) (footnotes omitted). "A plaintiff is also entitled to recover compensatory damages for non-economic loss or injury [which] 'include pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life.'" Id. (quoting Elliott v. Cobb, 320 S.W.3d 246, 247 (Tenn. 2010)).

"It is well-settled that the party seeking damages carries the burden to prove them." Sisco and Close Properties v. C & E Partnership, 2012 WL 6757939, at *5 (Tenn. Ct. App. Dec. 20, 2012) (citing BankcorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 229 (Tenn. Ct. App. 2006)). "'All that an award for damages requires is proof of damages within a reasonable degree of certainty.'" Id. However, "[a]bsent proof of damages, 'there can be no award of damages,'" and "[c]ourts may not award damages that are 'based on mere conjecture or speculation.'" Id.

### 1. Economic Damages

Plaintiffs seek recovery for economic damages in the form of past medical expenses, expected future medical expenses, and lost earning capacity.

### a. *Past Medical Expenses*

Plaintiffs request $251,973 for past medical expenses. This figure is based upon their "Rule 1006 Summary of Roben Carter's Past Medical Bills." (Pf. Ex. 1). Alternatively, they request 40% of that figure, which purports to be the amount that Dr. Carter was required to pay for medical bills.

Under Tennessee statutory law,

> In a malpractice action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law) actual economic losses suffered by the claimant by reason of the personal injury including, but not limited to the cost of reasonable and necessary medical care, rehabilitation services, and custodial care, loss of services and loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually.

Tenn. Code Ann. § 29–26–119. That statute has been construed as follows:

> Tenn. Code Ann. § 29–26–119 states that a medical malpractice plaintiff may not recover for the cost of medical care if that cost was indemnified in whole or in part

by employer-provided insurance. The statute seeks to prohibit injured parties from making a double recovery by reducing a plaintiff's recovery by the amount of benefits paid by employer-provided insurance. See Nance v. Westside Hosp., 750 S.W.2d 740, 742 (Tenn. 1988). Excluded, however, from the statute's general operation are collateral payments made where the collateral payor has subrogation rights. See Nance v. Westside Hosp., 750 S.W.2d at 743. Where the injured insured must repay the insurer out of any damages recovered, the insured gets no double recovery. Stated another way, where a right of subrogation exists or where the tort victim has a legal obligation to repay the collateral source payor, then the victim's losses have not been "replaced or indemnified" for purposes of Tenn. Code Ann. § 29–26–119. See Nance v. Westside Hosp., 750 S.W.2d at 743; Hughlett v. Shelby County Health Care Corp., 940 S.W.2d 571, 574 (Tenn. Ct. App. 1996).

Richardson v. Miller, 44 S.W.3d 1, 32 (Tenn. Ct. App. 2000).

In light of the statute and its construction by Tennessee courts, it is clear that Plaintiffs are not entitled to recover the entire $251,973. When Mrs. Carter was treated at BACH, the treatment was paid for by the Government. After Dr. Carter left the military, he received COBRA insurance through TRICARE. No evidence suggests that any entity has sought or will seek a subrogation lien against any award of damages, and 32 C.F.R. § 537.4 states that claims by the Government for medical services and expenses are not collectible "[w]here the tortfeasor is a department, agency or instrumentality of the United States."

Nor will the Court award Plaintiffs 40% of the $251,973. Plaintiffs' sole support for that request is the following colloquy between the Court and Dr. Carter:

THE COURT: All right. I'm a little confused. I've got a question. Of the 251,000 what portion of that did you pay out of your pocket? What portion of that was paid by insurance? How does that break down as to what you personally paid for out of your pocket? I've got the 12,000. There are co-pays, but you're not sure how many. And then there would have been some deductibles in there?

THE WITNESS: Yeah.

THE COURT: Do you know how much?

THE WITNESS: I would have to look to really --

19

THE COURT: Do you know what the break down is, of the 251- how much was covered by insurance and how much was not?

THE WITNESS: It would have to be at least 60, 70 percent, I would think.

THE COURT: Is covered?

THE WITNESS: I think.

THE COURT: All right. But you're not sure?

THE WITNESS: No. I'm just writing checks when I get billed. I don't know.

THE COURT: Well, okay. But you're writing checks when you get bills. Did you go back through and look and add up how much you wrote in checks? What you paid?

THE WITNESS: Personally I haven't.

(Docket No. 61, Tr. Tran. at 175-76). No receipts, cancelled checks, credit card statements, or other documents were offered to support the suggestion that Dr. Carter paid 30% to 40% of the bills. Dr. Carter's belief is speculative and thus the Court finds it insufficient to support a $75,000 to $100,000 award.

As for the payment of COBRA premiums in the amount of $18,000, Plaintiffs have not established entitlement to the same. When Dr. Carter left the military, he purchased COBRA insurance. Presumably that was done so that his entire family would have insurance coverage, and presumably COBRA insurance would have been purchased regardless of Mrs. Carter's condition. Plaintiffs have not shown that Defendant's negligence caused the purchase and, more fundamentally, they have not shown that the premiums paid were attributable to Mrs. Carter's condition. Given the record, the Court would have to speculate that the $18,000 was paid as a result of Defendant's negligence.

Under the statute, Plaintiffs are entitled to recover the $12,000 that was paid out-of-pocket

for the breast reconstruction surgery that the Government appears to concede is appropriate. Accordingly, the Court will award Plaintiffs $12,000 for past medical expenses.

### b. Future Medical Expenses

Plaintiffs seek $767,069. in future medical expenses based upon the present value calculations of Dr. Cohen. That figure breaks down as follows:

```
Breast cancer recurrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 511,304.00
Lung metastasis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  80,813.00
Liver metastasis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  80,813.00
Brain metastasis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  94,139.00
                                                            Total:    $767,069.00
```

(Docket No. 67 at 29-30).

The Court will not award the amount requested because it is based upon two premises that lack sufficient evidentiary support. First, Plaintiffs' figures are based upon the assumption that if the cancer returns it will spread to the lungs, liver, and brain. Second, Plaintiffs' figures assume treatment for four years.

As to the first point, the Court cannot say that it is more likely than not that, should Mrs. Carter's breast cancer return, it will necessarily spread to the lung, liver, and brain. Dr. Abramson, Plaintiffs' treating oncologist, did not so testify. The only testimony on this score by Dr. Abramson that the Court recalls is her unexplored statement that cancer cells "could attach onto another organ like the liver or lung. And when cancer recurs, it recurs outside of the breast, somewhere else in the body and grows there, and that's what kills them." (Docket No. 61 Tr. Tran. at 62-3). She offered no opinion at trial on the likelihood that a recurrent cancer would occur in those organs, and her expert report only makes a passing reference to "a significant degree of spread and area of invasion" (Abramson, Ex. Report at 3), without any reference to the location(s) where that is likely to occur.

Ms. Lampton testified that Mrs. Carter was "at risk for metastasis to the lung, liver, and brain." (Docket No. 61 Tr. Trans. at 8). However, that was hearsay testimony based upon what Dr. Abramson and Dr. Avery (an oncologist in Knoxville, Tennessee) allegedly told Ms. Lampton. She conceded on cross examination that neither doctor gave "probabilities on those metastasis[.]" Id. at 35.[18]

Similarly, Plaintiffs have failed to show by a preponderance of the evidence that, should the cancer recur, Mrs. Carter will require treatment for four years. Again, Dr. Abramson did not so testify, and her supplemental expert report can be read to suggest short survival period because the report states that, upon recurrence, "chemotherapy will extend her life . . . by perhaps a year or more." (Abramson Supp. Report at 2). For her part, Ms. Lampton only presented hearsay testimony that Mrs. Carter may need to "receive[] treatment for two years or four years, based on Dr. Abramson's opinions" that, "[d]epending upon how the cancer responds to the treatment, [Ms. Carter] can need treatment for two years or she can need it up to four years depending upon the aggressive nature of the cancer or the type of cancer that it is." (Docket No. 62 Tr. Tran. at 15). Ms. Lampotn made clear that "Dr. Abramson gave me the two- to four-year timeframe of treatment," and that Dr. Avery told her it would most likely be two years. (Docket No. 62, Tr. Tran. at 15 & 36). "'To remove awards for future medical expenses from the realm of speculation, persons seeking future medical expenses must present evidence . . . that additional medical treatment is reasonably certain to be required in the future'"; this "'requires more than a mere likelihood or possibility.'" Singh v. Larry Fowler Trucking, Inc., 390 S.W.3d 280, 287 (Tenn. Ct. App. 2012)

---

[18] When counsel for Plaintiffs questioned Dr. Abramson about the reasonableness of Ms. Lampton's calculations for treatment of lung, liver and brain cancer, the question was qualified: "can you tell us whether those appear to be reasonably necessary *should* she [Mrs. Carter] at some point have cancer spread to those various areas that are indicated?" (Docket No. 61, Tr. Trans. at 69).

(quoting <u>Henley v. Amacher</u>, 2002 WL 100402, at *13 (Tenn. Ct. App. Jan. 28, 2002)).  The plaintiff must "'prove that he or she will, more probably than not, need these medical services in the future.'" <u>Id</u>.

The Court recognizes that Rule 703 of the Federal Rules of Evidence permits an expert to testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions.  However, "Rule 703 'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" <u>Factory Mut. Ins. Co. v. Alon USA L.P.</u>, 705 F.3d 518, 524 (5th Cir. 2013) (quoting, <u>Loeffel Steel Prods., Inc. v. Delta Brands, Inc.</u>, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)).  "The rule 'was never intended to allow oblique evasions of the hearsay rule.'" <u>Id</u>.; <u>see also</u> <u>Trepel v. Roadway Exp., Inc.</u>, 194 F.3d 708, 721-22 (6th Cir. 1999) ("'Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury.  In such a case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence control'") (citation omitted).

The record is simply insufficient to conclude that if the cancer returns it will metastasize to the liver, lungs, or brain, let alone all three organs.  It is also insufficient to conclude that, if the cancer does recur, Mrs. Carter will require treatment for four years.

The finding that the record does support is that breast cancer is more likely than not to recur, and the Court will accept that there will be two years of treatment, a conclusion the Government

does not appear to contest.[19]  According to the present value calculations made by Dr. Cohen, the costs of treatment for breast cancer for a two year period are between $140,231 and $261,372. Although there is no competent evidence on the likelihood that the cancer will spread to the liver, lungs and/or brain, the Court will award the highest projected figure for the return of breast cancer – $261,372 – in an attempt to at least partially take into account the fact that Dr. Abramson opined that breast cancer would spread somewhere.

### c. Lost Earning Capacity

Upon a finding of negligence, an injured party is entitled to recover damages for her "lost earning potential." Meals *ex rel.* Meals, 417 S.W.3d at 420.  In determining the extent of a plaintiff's loss of earning capacity,

> it is proper to take into consideration plaintiff's age, and in like manner, attention may be brought to his health, character, capacity, ability to work, intelligence, skill, talents, experience, training, and industry.  In addition, it is proper to consider plaintiff's habits, and other personal qualities.  Other matters to be considered are plaintiff's surroundings, record of employment, and station in life, his expectancy of life, his occupation, business or profession, the effect of the injury thereon, the value of his services, avenues of occupation open to him, and the physical capacity of plaintiff to perform his work at the time he was injured and thereafter.

Graves v. Jeter, 2004 WL 3008871, at *4 (Tenn. Ct. App. Dec. 21, 2004) (citation omitted).

Ms. Jones testified as an expert on Mrs. Carter's lost earning capacity, and Dr. Cohen found her assumptions to be "fair enough." (Tr. Trans. Docket No. 63 at 6).  The Government does not challenge Plaintiffs' request to the extent it is based on future value as calculated by Dr. Cohen. Accordingly, and having considered the evidence that was produced at trial, the Court will award $628,440 as damages for Mrs. Carter's lost earning capacity.

---

[19]  In its proposed findings, the Government concedes that "a maximum of two years of future medical damages for treating a recurrence of cancer is appropriate."  (Docket No. 66 at 11).

### d. Recap of Economic Damages

Based upon the foregoing, the Court will award economic damages in the following amounts:

| | |
|---|---|
| Past medical expenses | $ 12,000 |
| Future medical expenses | $261,372 |
| Lost earning capacity | <u>$628,440</u> |
| **Total** | **$901,812** |

## 2. Non-Economic Damages

In addition to damages for past and future medical expenses and lost earning capacity, Mrs. Carter seeks $30 million in non-economic damages. As noted previously, non-economic damages include damages for permanent impairment and/or disfigurement, pain and suffering, and loss of enjoyment of life, both past and future. Because non-economic damages are not capable of precision, "a plaintiff is generally not required to prove the monetary value of non-economic damages." <u>Meals</u> *ex rel.* <u>Meals</u>, 417 S.W.3d at 419.

### a. Permanent impairment and/or disfigurement

With regard to damages for permanent impairment and/or disfigurement, the Tennessee Court of Appeals has explained:

> A permanent injury differs from pain and suffering in that it is an injury from which the plaintiff cannot completely recover . . . . It prevents a person from living his or her life in comfort by adding inconvenience or loss of physical vigor. . . . Disfigurement is a specific type of permanent injury that impairs a plaintiff's beauty, symmetry, or appearance . . . . Permanent injury may relate to earning capacity, pain, impairment of physical function or loss of the use of a body part, . . . or to a mental or psychological impairment.

<u>Overstreet v. Shoney's, Inc.</u>. 4 S.W.3d 964, 714 (Tenn. Ct. App. 1999) (citations omitted).

But for the negligence of BACH's healthcare providers, Mrs. Carter likely would have

received treatment in the form of a lumpectomy, followed by chemotherapy and radiation. However, because she was diagnosed at Stage III, further injury resulted, requiring additional treatments that caused pain and suffering, including a mastectomy, removal of 21 lymph nodes where the cancer had metastasized, and reconstructive breast surgery that included harvesting a skin graft from her inner thighs.

As a result of the negligence, Mrs. Carter is forced to live with pain and swelling in her right arm from lymphedema. That pain and swelling runs from her elbow to her neck and is aggravated by certain everyday tasks such as driving, typing, and putting away dishes. Even sleep can be painful if Mrs. Carter lies on her right side, and activities Mrs. Carter took for granted (such as coaching her daughter's gymnastics team) are now limited. Additionally, in an effort to reduce the swelling, Mrs. Carter is required to wear a compression sleeve and undergo therapy.

The additional surgeries also resulted in disfigurement. Even apart from the lymphedema which causes her arm to swell, Mrs. Carter has been subjected to significant scarring on her chest, right arm, and inner thighs. Such scarring affects how she dresses, among other things. Further, despite her desire to have symmetry in her breasts, her breasts do not appear "normal" because among other things, skin that grows hair was taken from her thighs to construct nipples.[20]

### b. Pain and suffering – Past and Future

Pain and suffering "encompasses the physical and mental discomfort caused by an injury" and "includes the 'wide array of mental and emotional responses' that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry."

---

[20] The Court specifically rejects Dr. McClure-Barnes's suggestion that opting for a double mastectomy was somehow a "choice," and one that would have been made had the cancer been discovered during its early stages.

<u>Huskey v. Rhea County</u>, 2013 WL 4807038, at *15 (Tenn. Ct. App. Sept. 10, 2013) (citation omitted). In addition to the physical pain and suffering Mrs. Carter endured as a result of the likely unnecessary mastectomy, lymph node removal, and breast reconstruction surgeries, she suffered and will suffer mentally and emotionally as a result of the missed diagnosis.

Mrs. Carter is well aware of her prognosis and experiences genuine and serious fear that her cancer will fatally recur. This fear is constant and particularly acute when Mrs. Carter returns for her semi-annual check-ups with Dr. Abramson, or when Mrs. Carter suffers from a normal malady, such as a cold. Mrs. Carter also fears going through an additional round of chemotherapy, which probably would not have been necessary had the cancer been diagnosed when she first presented at BACH. She also recognizes that, despite another round of chemotherapy treatment (and the accompanying gastrointestinal difficulty, esophageal problems, nausea, vomiting, weakness, hair loss, and pain), she will likely die.

Her fear also includes the inability to care for her family and to participate in family activities as she has done in the past. She also has significant fear and concern about the future fate of her family given the statistical probability that, not only will the cancer return, it will be fatal.

### c. Loss of Capacity for the Enjoyment of Life – Past and Future

With regard to the loss of capacity for the enjoyment of life, the court in <u>Overstreet</u> explained:

> Damages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life . . . . This type of damage relates to daily life activities that are common to most people . . . . It can also compensate a victim for the loss of uncommon individual pursuits or talents . . . The policy underlying the award of loss of enjoyment damages is of making the victim whole in the only way a court can—with an equivalent in money for each loss suffered.

<u>Overstreet</u>, 4 S.W.3d at 715-16.

Because diagnosis occurred at Stage III rather than Stage I, Mrs. Carter likely will never completely recover from her cancer and her life expectancy has been tremendously reduced. At the time of trial, Mrs. Carter was 40 years old with a life expectancy of another 40 years. The failure to properly diagnose her breast cancer means that, more likely than not, her expected life span has been cut in half.

Moreover, and as already noted, Mrs. Carter is not presently living a "normal life." In addition to the pain she suffered from the likely unnecessary surgeries, she mentally and emotionally struggles with the prospect that cancer will return and cause her death. She has been (and will continue to be) unable to enjoy life as she knew it prior to the diagnosis of her Stage III breast cancer. Simple but important things – like a former gymnast teaching her daughter gymnastics – are no longer possible.

The greatest loss has been and will be the inability to give and share love with her family, including her husband and minor children. Having undergone cancer treatment once, she is well aware of its incapacitating effects and knows that upon recurrence, her ability to give and share the enjoyments of her life with her family will be drastically affected. Mrs. Carter also knows full well that death in a few years is a real probability and that she will not be there to share a life with her husband and children, or to watch and care for her children as they grow into adulthood.

### d. *Award of Non-Economic Damages*

"Assigning a compensable, monetary value to non-economic damages can be difficult," <u>Meals *ex rel.* Meals</u>, 417 S.W.3d at 419, and "involves a subjective element not present in the determination of ordinary facts," <u>Adams v. Leamon</u>, 2013 WL 6198306, at *3 (Tenn. Ct. App. Nov.

25, 2013).  It "is not an exact science, nor is there a precise mathematical formula to apply in determining the amount of damages an injured party has incurred."  Meals *ex rel.* Meals, 417 S.W.3d at 419. Having fully considered the record and the arguments of the parties, and recognizing that any amount of damages will never truly make Mrs. Carter whole or place her in the position that she was in prior to the misdiagnosis, the Court will award her $3,000,000 in non-economic damages, or roughly three times the economic damages award.

## C.  Dr. Carter's Loss of Consortium Claim

While a loss of consortium is derivative in the sense that it arises from the injured spouse's claims, it is a distinct and separate cause of action.  Hunley v. Silver Furniture Mfg. Co., 38 S.W.3d 555, 557 (Tenn. 2001).  Generally, consortium "'is the conjugal fellowship of husband and wife, and the right of each to the company, cooperation, affection and aid of the other in every conjugal relation[.]'"  McPeek v. Lockhart, 174 S.W.3d 751, 755 (Tenn. Ct. App. 2005) (quoting, Jackson v. Miller, 776 S.W.2d 115, 116-17 (Tenn. Ct. App. 1989)).

Dr. Carter has in the past and will in the future suffer the loss of consortium of his wife.  For approximately one year, Dr. Carter lost services, companionship, and sexual relations with this wife while Mrs. Carter was undergoing treatment for her cancer.  Although some of that loss was due to chemotherapy treatment which would have also occurred had a proper initial diagnosis been made, part of the loss was due to the fact that Mrs. Carter was subjected to additional surgeries and the attendant recovery periods.

If the cancer returns, and it most likely will, Dr. Carter will again experience the loss of his

wife's services, companionship, and sexual relations.[21]  As of the time of trial, the Carters had been married approximately 15 years.  For most of the marriage, Mrs. Carter put her aspirations on hold to support her husband's career and raise a family.  She has provided most of the "intangible benefits" concerning the daily needs of her family, tasks that will fall on Dr. Carter should the cancer return.

Dr. Carter, like his wife, understands that the cancer will likely return and that Mrs. Carter will have to  undergo painful treatment during which time he will be deprived of much of his wife's companionship and services. Dr. Carter also recognizes that the cancer treatments will ultimately be futile, he will face life without his wife, and he will be deprived of her companionship, love, and affection.  More likely than not, he will be the one to watch over the children as their mother dies and the one who will need to console them. More likely than not, he will be deprived of his wife's guidance and solace when misfortunes occur.  More likely than not, he will not have her at his side when good things happen, such as their children's graduations and marriages, and the birth of their grandchildren. And, more likely than not, he will lose his life partner, including her company, love, affection, companionship, fellowship, sexual relations, and all of the intangibles that go into a marriage.  For those losses, the Court will award Dr. Carter $1,000,000.00.

Plaintiffs also request funeral expenses in the amount of $45,569.81 as a part of Dr. Carter's consortium claim.  Under Tennessee law, a surviving spouse may be awarded reasonable funeral expenses for a wrongful death.  See Knowles v. State,49 S.W.3d 330, 331 (Tenn. Ct. App. 2001).  The Government concedes that reasonable funeral expenses should be awarded.

---

[21]  In the unlikely event that cancer does not recur soon, the Carters still suffer from the fear that it will recur at some point.  It is doubtful that either will ever truly believe that Mrs. Carter is cancer free.

The only evidence received on funeral costs came from Mr. Creech who testified that a cost of a traditional funeral in 2013 was $16,940 and that the estimated cost of that same funeral in 2020 would be $21,239.00, and that a "top line" funeral cost $37,661.00 in 2013, which would rise to rise to $45,569.81 in 2020.

Plaintiffs have not established the need, propriety, or reasonableness of a "top line" funeral that includes "special services and merchandise." The Court will award $19,089.50 for funeral expenses which is the mid-range point of the figures that Mr. Creech gave for a traditional funeral services between 2013 and 2020.

"'[L]oss of services is a part of the loss of consortium,'" Huskey, 2013 WL 4807038, at *18, and Plaintiffs request $312,689 for the loss of Mrs. Carter's future household services. This figure is based Dr. Cohen's present value discount of Dr. Missun's analysis, which predicted the value of Mrs. Carter's services over the 31.2 years that Dr. Carter is expected to survive. The requested amount, which translates to approximately $10,000 a year, is reasonable, supported by expert testimony, and will be awarded by the Court.

In sum, Dr. Carter will be awarded $1,331,778.50 on his loss of consortium, including damages for funeral expenses and the loss of Mrs. Carter's services.


### III. CONCLUSION

On the basis of the foregoing, the Court finds liability in favor of Plaintiffs and against Defendant. The Court will award Plaintiffs $5,233,590.50, consisting of $901,812 in economic damages for past medical expenses, future medical expenses, and lost earning capacity, $3,000,000 in non-economic damages to Mrs. Carter, and $1,331,778.50 on Dr. Carter's loss of consortium

claims, which includes damages for funeral expenses and loss of services.

An appropriate Order will be entered.

_____
Kevin H. Sharp
United States District Judge